## High Gravity Oil Company v. Row's Administrator.

(Decided March 13, 1925.)

### Appeal from Magoffin Circuit Court.

1. Death—Instruction Held Erroneous as Furnishing no Measure of Damages.—In death action, instruction to find for plaintiff in such amount as would compensate him for injuries received, not exceeding amount prayed held erroneous as furnishing no criterion to determine amount of verdict.

2. Appeal and Error—Mere Objection to Incorrect Instruction Sufficient.—While court, in civil case, need not give whole law thereof, and issue not presented by offered instruction will not be considered on appeal, court instructing jury on particular material point must do so correctly, and mere objection to incorrect instruction is sufficient.

3. Master and Servant—Injury by Jagged Wire Rope Not Result of Negligence.—Injury of deceased in catching hand on broken wires of rope of which he voluntarily took hold would not be result of actionable negligence, where defect could be plainly seen and he was not performing any duty for which he was employed.

4. Master and Servant—Use of Jagged Wire Rope Held Not Negligence.—That jagged wire rope was unsafe, in sense that it might break, held not to show actionable negligence resulting in injury to employee catching hand on wires, where dangerous places were open and visible to him.

5. Master and Servant—Employee Held Negligent in Grasping Jagged Wire Rope.—Employee held contributorily negligent in taking hold of wire rope, where jagged wires visibly protruded by which hand was caught and dragged into pulley.

BEVERLEY R. JOUETT and J. B. ADAMSON for appellant.

JOHN H. GARDNER and W. R. PRATER for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant and defendant below, High Gravity Oil Company, undertook to move an oil drilling machine from one part of Magoffin county to another, a distance of ten miles or more, and in doing so it necessarily traversed some rough mountainous roads. It used as motive power in the operation six mule teams and also a five-eighths wire rope that worked in a pulley encased in a snatch hook, and the latter was attached to the end of the tongue of the machine, but the wire rope and the snatch hook were not used except in climbing hills or mountains, when one end of the rope would be fastened to a stationary object at the side of the road with the other one passing through the pulley in the attached snatch hook, and to it were hitched the other five teams, one of them being hitched to the doubletrees at the front wheels, and which latter team served as a guide to hold the machine in the road. The part of the wire rope, when it was used, between the pulley and the point where it was attached to the stationary object was called the "deadline," and of course did not move though the snatch hook

and pulley were climbing up it when the machine was being moved in that manner.

Among the teams hired and being used was one belonging to R. C. Row, who accompanied it and was supposed to drive and manage it while the moving was being done. In ascending a mountain with the machine, and when it had reached near the top, the wire rope and snatch hook were arranged in the manner indicated for the last pull over that particular mountain, and Row's team was hitched to the wheels of the machine as the guiding one. There was a slight curve in the road and both lines of the rope were of course taut and did not follow the curve in the road. The foreman in charge for the defendant, and a brother of R. C. Row were pushing the deadline towards the road, using their hands, and the latter spoke to his brother, R. C. Row, and requested him to have his team, which as we have seen was the guiding one, to hold the machine in the road; but instead of doing that R. C. Row himself took hold of the deadline some twenty feet nearer the snatch hook than did his brother and almost immediately thereafter his right hand was caught in the pulley which had climbed the deadline to the point where he had hold of it and resulted in mashing off two of his fingers, from which it is alleged blood poison afterwards developed resulting in his eventual death.

This action was brought in the Magoffin circuit court by his brother, who qualified as his administrator, to recover damages for his death, upon the ground that defendant was negligent in furnishing a defective rope with which to do the work and in furnishing to the deceased a pair of gloves to be used by him while engaged in the work. One of the alleged defects in both the rope and the gloves was that they were each poisoned in some unexplainable manner and which was transmitted to the wounds of the deceased, resulting in his death. That allegation, however, was denied and there was absolutely no proof to sustain it. It was further alleged in the petition as an act of negligence that the rope was an old one and that it had on it at places what is designated in the petition as "frazzles," i. e., an occasional breaking of the small wire out of which it was made, with corresponding short spears made by the projecting ends of the broken wire. We do not find in the petition any other alleged defect in the gloves than the one referred to.

The answer denied all of the averments of the petition and also contained a plea of contributory negligence which was placed in issue and upon trial the jury under instructions of the court returned a verdict in favor of plaintiff for the sum of $2,500.00, the amount claimed in the petition being $2,995.00. Defendant's motion for a new trial was overruled and from the judgment pronounced on the verdict it prosecutes this appeal, insisting that the court erred in (1), the instructions it gave to the jury, and (2), in overruling defendant's motion for a peremptory instruction in its favor, each of which we will dispose of in the order named.

1.   Instruction number 3 given by the court, which was the one measuring the amount of recovery if the jury found that the plaintiff was entitled to recover under the other instructions, said: "If you should find for the plaintiff it should be such an amount as would compensate him for the injuries received, not to exceed the sum of $2,995.00, the amount asked for in the petition." It requires no comment to demonstrate the erroneousness of that instruction. It furnished no criterion by which the jury would be guided in arriving at the amount of its verdict, and our decisions are all one way in condemning that character of instruction. One of the numerous cases in which it was done is that of Southern Railway Co. v. Barr's Admrx., 21 Ky. L. R. 1615, and it is both preceded and succeeded by numerous opinions to the same effect. In it, as well as all the others, it was specifically pointed out that in such cases the measure of the administrator's recovery was "such a sum as would compensate the estate of the decedent for the destruction of his power to earn money, and that in arriving at that sum they (the jury) might take into consideration the age of the decedent, his state of health, his earning capacity, and his expectation of life." But it is insisted that defendant did not ask for an instruction containing the true criterion for the measurement of the recovery, and not having done so it cannot complain of the error under consideration. The trouble with that insistence is that while it is true in civil cases the court is not required to give the whole law of the case, and that an issue not presented by an offered instruction will not be considered as before the court on appeal, yet it is likewise true in civil cases, that if the court attempts to instruct the jury upon a particular and material point it is its duty to do so correctly and a mere objection to

the incorrect instruction will be sufficient to entitle the complaining party to take advantage of the defect on appeal. And so, where a similar contention was made growing out of parallel facts, we said in the case of Davis v. Marks, 203 Ky. 477, on page 481: "In making that insistence, counsel for plaintiff evidently overlook another well settled rule of practice to the effect that if the court attempts to instruct the jury on any relevant phase of the case, it should correctly do so; and a party injured by an incorrect instruction may insist on a correct one, without offering it, since it is the duty of the court, when it attempts to instruct, to do so correctly."

2. In disposing of error (2), it will be necessary to set out the evidence as to how the accident happened to the deceased as given by the plaintiff, his brother, and who was the only witness who testified thereto at the trial for plaintiff. On that point he was asked and answered:

"Q. Tell the jury how the accident occurred and the cause of it? A. We were blocking up that hill over there and we came to the last pull and we thought we could pull it and the line was hitched on top of the hill to some hickory bushes and in pulling it it pulled the machine out of the road and Mr. Hook, Row and myself taken hold of this line, and me and Mr. Hook were up above Row, and he was down next to the machine and I was between the two men, Row was probably 20 feet below me and he were on the opposite side of the line from where I was and the machine pulled on up to where he was and when he expected to get loose, the glove caught him and he could not get loose. Q. How did the glove catch? A. This was a frazzled line, or a line that had frazzled places on it, and it caught these two fingers and drawed around so that he could not free himself. Q. What did he say to you when you got to him? A. He said his glove had caught and cut his fingers off. Q. Did he say these things to you there at the time of the accident? A. Yes, sir. I asked him why he didn't get loose, he seemed to be surging at the glove, and he said that the rope whirled and caught these two fingers. Q. Did he say the rope caught the gloves on these fingers? A. Yes, sir. Q. Did you see him try to free himself? A. Yes, sir, he freed the right hand but could not free the left hand. Q. Did I understand you to say

he freed one of the hands and could not get the other out? A. Yes, sir. Q. Was Hook present at the time that Row made these statements to you? A. Yes, sir, he was. Q. Did you see the glove and two fingers that were torn from his hand immediately after it was done? A. Yes, sir. Q. Could you tell from the glove, hand or rope, whether or not this glove had caught on the rope? A. The fingers of the glove were left on the line after it went through the block, it remained on the line sticking to it. Q. Was the glove still hanging on the rope and attached to the broken barbs as it went through the block? A. The end of the fingers and glove were still fastened on the little 'jaggers' on the rope. I pulled them off myself. . . . Q. What was the condition of the rope at the time he furnished it to you? A. When we got it it was covered with some dirt where they had been using it. Q. You say it had been used? A. Yes, sir. Q. Did it have any broken strands of wire on it? A. Yes, sir, in a number of places. . . . Q. Do you know who furnished Row with the glove he had on at that time? A. Mr. Hook. Q. Why did he furnish them to him? A. His hands were sore.''

On his cross-examination he was asked and answered:

''Q. How did he have hold of this rope with the hand that got hurt? A. He had his hand closed around it in this way (shows). Q. How was it that his glove was caught in the rope? A. When I saw him he was surging, looked like he was trying to get loose from the rope. Q. How was the glove caught? A. It looked to be caught in the frazzles; he freed the left hand but didn't get the right loose. Q. Was there anything to keep him from getting his hand out of the glove, was there? A. Only what he said about it. Q. Was it just an ordinary canvas glove? A. Yes, sir. Q. The wire didn't catch his fingers? A. It was caught with these 'jaggers,' fingers and all. Q. What kind of 'jaggers' were you speaking of? A. These ropes are made of several small strands, which had been broken, which made a frazzled place, or wickers, I think they called them. Q. How much did these 'jaggers' stick up? A. Very little, when they are broken. Q. How many were broken? A.

I didn't examine. Q. How much of the surface was broken? A. *Not a great deal.* I never thought about *examining* it. Q. When did you examine it? A. I never did at all. The only thing I did I stooped down and got the ends of the glove and fingers that were left on the wire. Q. Do you mean to say that these fingers had passed through this block when you got there? A. Yes, sir. Q. How big a place was there in the block where the rope went through. A. Not very large. Q. Does this rope work on a pulley? A. Yes, sir, it does."

The only other witness who testified at the trial concerning what happened at the time was a Mr. Hook, defendant's foreman upon the job, and he agreed with plaintiff as to the extent of the accident and how it happened, but he denied that the rope was an old one or had any frazzles on it. On the contrary, he stated that it was a new one and had never been used except at the beginning of that move some three or four days prior to the accident. He furthermore stated that decedent was not hired, nor was it any part of his duty, to take hold of the dead line or any part of the wire rope; that his duties consisted in looking after his team and its management. The witness furthermore stated that he did not direct the decedent to take hold of the dead line on that or any other occasion, and neither did he furnish the decedent the gloves complained of as a part of any equipment designed for accomplishing the work, but only suggested to him after he had complained of his hands being sore that he, witness, had a pair of gloves and would give them to him if he desired. Plaintiff's testimony on that point was:

"Q. Do you know who furnished Rowe Row with the glove he had on at that time? A. Mr. Hook. Q. Why did he furnish them to him? A. His hands were sore. Q. At the time there that Mr. R. C. Row said that his hands were sore from handling the rope, who furnished him the gloves of which you speak? A. Mr. Hook was the man who furnished the gloves."

Hook's testimony on that point was:

"Q. Did you notice whether he had on gloves that day, or at that time? A. Well, he had on one

glove. He had taken off the other when I met him. Q. The one he had taken off, was that on the injured hand or on the other hand? A. On the injured hand. Q. And he had a glove on the uninjured hand when you saw him? A. As I remember it, yes, sir. Q. Do you know where he got those gloves? A. Yes, sir. Q. Where? A. I gave them to him. Q. When? A. That morning. Q. How did you happen to come to offer them to him? A. In working the line, they said that his hands were sore and cracked, and the bushes and briars hurt them, and I said, 'Why, here, I have a pair of gloves I don't need and I will give them to him.' Q. When you made that statement to Mr. Row what did he do? A. He took the gloves and put them on his hands. Q. How long was that before the accident? A. I could not say—it might have been thirty minutes, and it might have been an hour. Q. Had he been using them on his hands before this accident occurred? A. Yes, sir."

And the testimony as set out and given by those two witnesses was all that was heard upon the trial as to how and under what circumstances the decedent sustained his injury.

It will be observed that plaintiff, in testifying for himself as representing the estate of the decedent, makes it plain that the wire rope was not frazzled except at occasional places; that those places were perfectly visible and could be easily seen by the witness and presumptively so by the decedent; that neither witness nor Hook, the defendant's manager, directed the decedent to take hold of the rope upon the occasion when he was injured and that he did so of his own accord; that the gloves were made of canvas and nothing is detailed concerning them to show any probable danger from their use; that they were furnished not as a part of the equipment but as an accommodation to the decedent and to relieve him from the consequences of what he claimed to be his sore hands; but whether they were made sore by the wire rope or from briars and bushes through which the movement was made, and as testified to at the trial, it does not appear; that nowhere does plaintiff state that decedent's hands were hung to the wire rope or the gloves in which they were encased before coming in contact with the pulley, and his illustration as to the words and gestures of his brother at the time of the accident clearly indicates that his hand was caught in the pulley at that time.

If, however, plaintiff's theory that the broken wires caught the glove or the hand of the decedent before the pulley reached it was true, then we are confronted with the further fact that no one directed decedent to take hold of the rope or selected any place at which he should do so, and both of those acts, we repeat, were of his own volition. As we have hereinbefore stated, he could see the place of the jagged wire, if it existed, which itself remained stationary all the while, the rope not passing through his hands, and thereby snagged or otherwise caught and injured them. Viewing the case, therefore, from the standpoint of plaintiff's theory that the decedent's hand was caught on the broken wires of the rope, there would then exist no actionable negligence on the part of the defendant, since the rope was but a simple tool and decedent selected the place he took hold of it, to say nothing about his doing so at all when at the time he was not performing any duty for which he was employed. Independently, however, of that, the evidence as we have heretofore intimated plainly indicates that the fastening of the decedent's hand to the rope, as testified to by plaintiff, was the result of its being caught in the pulley and not because of any protruding small wires. The injury, therefore, was not caused by any defect in the proper use of the rope but because of the voluntarily selected manner of its use by decedent.

It is true that plaintiff introduced other witnesses to show that a jagged wire rope was an unsafe one, but the rope did not break on the occasion in question and no injury resulted from its doing so. It was not being drawn through decedent's hands, as we have stated, and although it might have been a dangerous rope in the sense that it might break and produce injury, yet it possessed no inherent danger to take hold of when the alleged dangerous places were open and visible to the one who did so; and the testimony of those witnesses clearly indicates that they were speaking of the character of danger first above referred to and not to the one insisted on by counsel for plaintiff. We, therefore, conclude that there was no actionable negligence shown in this case; but if there had been decedent was also guilty of contributory negligence in taking hold of the rope at a point where the jagged wires protruded, and but for which he would not have sustained his injuries, even if they were produced as plaintiff insists.

It results from the foregoing conclusions that the court erred in not sustaining defendant's motion for a peremptory instruction, and the judgment is reversed with directions to set it aside and grant a new trial and for proceedings consistent with this opinion.